UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

ROYAL CARMICHAEL,

                    Petitioner,

         -vs-                              **No. 11-CV-6294(MAT)**
                                           **DECISION AND ORDER**
STEVEN RACETTE,

                    Respondent.

---

## I.   Introduction

Royal Carmichael ("Carmichael" or "Petitioner") has filed a
<u>pro</u> <u>se</u> petition for a writ of habeas corpus pursuant to 28 U.S.C.
§ 2254 challenging his detention in Respondent's custody as the
result of a judgment of conviction entered on May 2, 2006, in
New York State Supreme Court (Monroe County) (Affronti, J.).
Petitioner was convicted, following a jury trial, on charges of
second degree (intentional) murder and criminal possession of a
weapon.

## II.  Factual Background and Procedural History

### A.   Overview

On the evening of July 8, 2005, two unidentified gunmen robbed
a crack house, allegedly belonging to Petitioner, located at
1 Langham Street in the City of Rochester. Later that night,
Petitioner, angry about the robbery and fearful that the robbers
would return, fired several shots from his .38 caliber revolver at
a group of neighborhood boys standing across the street from the
crack house. Petitioner wounded one of the boys, Anthony Williams;
and killed another, twelve-year-old Frederick Lewis.

The grand jury charged Petitioner with the following crimes: two counts of Murder in the Second Degree (New York Penal Law ("P.L.") §§ 125.25(1), (2)) (intentional and depraved indifference murder); Criminal Possession of a Weapon in the Second Degree (P.L. § 265.03(2)); Criminal Possession of a Controlled Substance in the Third Degree (P.L. § 220.16(1)); two counts of Criminally Using Drug Paraphernalia in the Second Degree (P.L. §§ 220.50(2)-(3)); and Criminal Possession of a Weapon in the Third Degree (P.L. § 265.02(1)).

Following the suppression of certain drug-related evidence, the prosecution withdrew the counts charging Criminal Possession of a Controlled Substance and Criminally Using Drug Paraphernalia. 1/10/06 Transcript at 2-3. Prior to jury selection, the prosecution withdrew the depraved indifference murder count. T.11-12.[1]

**B.   Trial**

**1. The Prosecution's Case**

**a.   Willie Joe Brown, Jr.**

Willie Joe "Dread" Brown, Jr. ("Brown") testified that some time in early 2005, he accepted Petitioner's proposal to use Brown's house at 1 Langham Street in Rochester as a "spot" out of which to sell crack cocaine. T.689-93. Pursuant to their agreement,

---

[1]    Numerals with the prefix "T." refer to pages from the trial transcript. Numerals with the prefix "H." refer to pages from the post-verdict hearing held on April 25, 2006. Numerals with the prefix "S." refer to pages from the transcript of the sentencing hearing. Numerals with the prefix "A." refer to the Petitioner's appendix on direct appeal in the Appellate Division, Fourth Department, which was submitted by Respondent as Exhibit A.

Petitioner, whom Brown knew as "Slim," paid Brown money and cocaine for the use of the house. He placed Eric Thomas ("Thomas"), a/k/a "E" or "Black", in charge of running the house. T.693-94. According to Brown, "[e]very now and then [Petitioner] came . . . to pick up the money or drop off another package" of crack cocaine. T.694.

Brown testified that he and Thomas were both at 1 Langham Street on the night of July 8, 2005, when two armed men forced their way into the house. The intruders relieved Brown and Thomas of their cash and drugs at gunpoint, and then fled. T.694-701, 720-25, 736. Petitioner arrived shortly thereafter and became angry upon learning of the robbery. T.701-04, 728-29.

After speaking with Brown and Thomas, petitioner stepped outside where, according to Brown, a group of four or five neighborhood "kids" could be seen "coming up the sidewalk" on the other side of Langham Street. T.702-07, 732-33. When someone said, "[t]here they go right there," the boys "took off running" in the opposite direction T.707-08, 734-35. According to Brown, Petitioner "took off behind" the boys, raised a handgun, "extended" his arm, and fired a shot. T.707-09, 730-32, 734-35. At that point, Brown went back into the house. Minutes later, he heard three or four more shots. T.709-10, 732.

### b.   Anthony "AJ" Williams, Marcus McKnight, and Jose Jiminez

Williams, McKnight, and Jiminez were in the group at which Petitioner fired. On the night of the shooting, seventeen-year-old Williams and sixteen-year-old McKnight were walking McKnight's

twelve-year-old brother, Lewis, home from the house of one of Lewis' friends. T.639-42, 740-44. On the way, Williams stopped at 1 Langham Street to buy some "weed" from Thomas. McKnight and Lewis waited across the street. T.642-45, 669-70, 676-77, 744-48.

As Williams was talking with Thomas at the entrance to 1 Langham, two unidentified gunmen ran past them and into the house. T.645, 671, 687-88, 747-50. Worried that the men intended to harm Thomas, Williams ran away from the house. McKnight and Lewis behind him. T.645-46, 671, 750-51.

A short time later, McKnight, Lewis, and Williams, accompanied by Williams' cousin, seventeen-year-old Jose Jiminez, returned to 1 Langham Street to check on Thomas. T.646-47, 752-54, 761, 777, 803-09, 818-21. The boys were near 1 Langham when they noticed that someone had extinguished the lights inside the house. They then saw a man come down the driveway and start shooting. T.647-50, 659-60, 664, 754-57, 763, 772-73, 782-86, 810-13, 821-22, 825. Jiminez identified the man as Petitioner, but Williams and McKnight did not see the shooter's face. T.649-50, 756.

The boys all fled, running through backyards and hopping fences. T.650-53, 665-66, 680-82, 757-63, 786-88, 813-15. Realizing that Lewis was missing, the boys searched and found him lying, presumably dead, in the backyard of 18 Langham Street, which is across the street and several houses down from 1 Langham Street. T.653-57, 682-86, 760-61, 763-64, 790-92. The boys called 911, and the police arrived soon thereafter. T.656, 658-59, 684-85, 764-65.

Williams sustained a grazing bullet wound to his buttocks for which he was later treated at the hospital. T.653, 657, 799-800.

There were several other discrepancies in the boys' accounts. According to Williams, the shooter pointed the gun at the boys as he shot. T.649. Jiminez, on the other hand, testified that Petitioner shot "in the air". T.813, 825-27. Jiminez testified that a fifth boy named Joshua Thomas came with them, T.818-19, 831-32, while Williams denied that either Jiminez or Joshua Thomas was present. T.642-43, 672-74. McKnight also testified that he was told that Jiminez had a pistol, though McKnight never actually saw it, and Jiminez did not fire it. T.780, 793-94. For his part, Jiminez testified that he was not carrying a gun that evening. T.817. The boys' accounts differed as to how many shots were fired. Williams heard a total of approximately seven shots. T.651, 664-65. McKnight heard more than three or four shots. T.757, 762, 788-89. Jiminez heard a number of gunshots, but he could not say how many. T.813-15, 827.

### c.   The Forensic Evidence

Lewis was found dead by the police in the backyard of 18 Langham Street at approximately 11:30 p.m. T.451-59, 764-65, 834-39. According to the Monroe County deputy medical examiner who performed the autopsy, the victim was twelve-years-old, four-feet ten-inches tall, and weighed approximately 78 pounds. T.950-51. He died from a single gunshot wound to the chest. The wound was "through and through", that is, the bullet entered through the chest and exited through the back. T.951-53, 963. The medical

examiner found no evidence that the entrance wound was a "contact wound," i.e., that the muzzle of the weapon was held in direct contact with the skin of the victim. T.952, 970, 1225-33. The entrance wound was "perfectly round" and one centimeter in diameter. T.958. No bullet projectile was recovered from the body. T.953-54. The bullet that killed Lewis was probably .38- or .40- caliber, based on the small size of the entrance wound and the amount of damage done to the victim internally. T.960-63.

Although the police canvassed the area of the shooting, they were unable to recover the projectiles that wounded Williams and killed Lewis. The police did recover a spent bullet from a tree in front of 16 Langham Street. The hole in which it was located was 7.3 feet above the ground. T.490-95, 573-78, 631-32. The projectile found in the tree was so damaged, however, that the police could only determine that it appeared to have been fired from a revolver rather than a semi-automatic pistol. T.988-994.

### d.   Petitioner's Statements to the Police

When initially questioned by the police on July 12, 2005, Petitioner denied frequenting 1 Langham Street. Confronted with evidence that he had been seen at the premises, Petitioner admitted that he occasionally went there to visit a girlfriend in the area and that he did so on the night of the shooting. He told the police that when he left 1 Langham on the night of the shooting, he heard some shots.

Faced with additional evidence that he had been identified as the shooter, Petitioner acknowledged that he did go to 1 Langham

-6-

after receiving a call from someone there he knew as "Black" (i.e., Thomas), telling him that he had been robbed. Although he admitted to supplying drugs to the house at 1 Langham, he continued to deny that he had been involved in any shooting. T.857-880, 922-927.

Ultimately Petitioner gave the police a written statement acknowledging his involvement in the shooting. T.1041-43. According to the statement, which was read into the record at trial, Petitioner went to 1 Langham Street on the night of July 8, 2005, after receiving a call that the house had been robbed. A.20. When he arrived at the house, he "was mad because [his associates] let somebody in the house." A.20.

Petitioner's associates told him that the robbers had "said they would be back." A.20. Petitioner went outside to the front of the house, and when he looked down Langham Street, he saw a "shadow by some bushes" which "looked like a dude." A.21. This caused Petitioner to pull out out his .38 caliber revolver and fire one shot "toward the bush." A.21. He then "heard a gunshot and . . . thought someone was shooting at [him]." A.21. Petitioner ran out onto Langham Street and fired two more shots toward where he heard "somebody jumping fences". A.21. He also heard other shots being fired. A.21. Petitioner's written statement concluded, "I just want to say that if I did shoot Frederick Lewis I'm sorry and I got to own up to my responsibilities." A.21-22. He stated that he "didn't know it might have been a little kid jumping over the fence," but "thought it might be an older person with bad intentions." A.22. Again, he explained that he had fired the shots because he was

"afraid," as his associates had told him that "the robbers would be back." A.22. Petitioner told the police that he had left the revolver at his mother's house at 145 Weyl Street in Rochester, where he resided. T.1043. The police recovered a six-shot .38 caliber revolver from a safe in his mother's bedroom. T.1035-1036, 1043-1045, 1079. The gun was loaded with five live rounds. When questioned about this, Petitioner said that he reloaded the gun after the shooting and threw out the spent shell casings. T.1045-46.

### 2.   The Defense Case

The theories of the defense were that there was no evidence of intent-to-kill and that, based upon the gunshot wound characteristics, Petitioner could not have fired the fatal shot.

Petitioner also called two experts to testify that in their opinions, the victim sustained a close-range or "contact-type" wound. T.1130-31, 1163-66. For instance, Charles Wetly, Chief Medical Examiner for Suffolk County ("Wetly"), testified that the distinctive marks on the entrance wound were caused by a firearm being pressed hard against Lewis's body. T.1164. Defense counsel argued that if Lewis had died as the result of a contact gunshot wound, Carmichael could not have fired the fatal shot.

Petitioner also called Jasper Moore ("Moore"), a resident of 18 Langham Street. Moore testified that on the night of the shooting, he heard four gunshots. Moore heard some people running through his yard, and then heard four more gunshots that sounded

-8-

like they came from his backyard. T.1116-20. Petitioner did not testify.

### 3.   The Prosecution's Rebuttal Case

In rebuttal, the prosecution called an expert firearms examiner and recalled the Monroe County deputy medical examiner to testify that the fatal shot was fired from a distance, and not at close range. T.1207-10, 1216-17, 1225-33.

### 4.   The Jury Verdict

On February 16, 2006, the jury returned a verdict finding Petitioner guilty of second degree (intentional murder) and criminal possession of a weapon in the second and third degrees. The jury rejected the lesser included offense of first degree manslaughter. T.1327-28.

### 5.   The Motion to Set Aside the Verdict

About one month after the verdict, and prior to sentencing, Petitioner's trial counsel filed a motion pursuant to New York Criminal Procedure Law ("C.P.L.") § 330.30(2) to set aside the verdict on grounds of juror misconduct. A.26-31. Petitioner claimed that just prior to jury deliberations, Juror Number 4 conducted internet research regarding gunshot wounds. A.28-29. In response, the prosecution submitted an affidavit from Juror Number 4 admitting to having researched gunshot wounds on the internet, but stating that his research "had no influence on [his] decision to find [Petitioner] guilty." A.32-38. The trial court ordered an evidentiary hearing which was held on April 25, 2006.

Each of the twelve jurors testified at the hearing. Juror Number 4, a licensed physician, testified that on the evening of February 15, 2006, just prior to the final charge and the beginning of jury deliberations, he "got on the Internet" in an attempt to resolve conflicting expert trial testimony regarding the distance from which the fatal shot was fired. H.7-9, 12, 15-16. He did not read any articles on the subject, but he did visit the University of Iowa's website, among others, and viewed approximately ten photographs depicting various types of entrance wounds. H.9-12. He stated, however, that his research did not help him resolve the conflicting testimony, and he remained "just as confused" or "unclear" about the distance from which the fatal shot was fired. H.10-12, 20-21. He testified that his internet research did not "in any way affect [his] verdict in this matter," which he averred was "based solely on the evidence that was heard in [the] courtroom." H.17, 21.

Juror Number 4 also testified that at some point he "may have mentioned" to other jurors that he had looked at photographs on the internet depicting "close range shooting and shooting from a distance." H.12-14. He did not, however, "tell them in any way what [his] conclusion was," because he was "still unclear." H.13.

Ten of the eleven other jurors testified that they recalled no discussion regarding Juror Number 4's internet research, and that their verdict was based solely on the evidence presented at trial. H.22-46.

Juror Number 12 testified that at some point before the verdict was reached, Juror Number 4 briefly mentioned that he had done "some research on the Internet on gunshot wounds." H.47-50. Juror Number 12 testified, "I remember that he was unsure, he said he did research on his own for a close contact gunshot wound and he just came to the conclusion on his own that, you know, basically the testimony of the defense, he didn't believe that-you know, he felt that it was not a contact gunshot wound based on what he saw." H.47. Juror Number 12 explained that "there were several people talking at the same time" when Juror Number 4 made this comment, and he was not sure if any of the other jurors heard it. H.48-50.

At the time, neither Juror Number 12 nor any of the other jurors asked any questions of Juror Number 4 about his comment. H.48-50. Juror Number 12 testified that the comment did not "in any way affect" his verdict, which he stated was based "solely" on what he "had already heard in the courtroom." H.49-51. Juror Number 12 testified that by the time Juror Number 4 made the comment, he "had already made [his] own determination" regarding the gunshot issue. H.51-52.

Following the evidentiary hearing, the trial court reserved decision and accepted additional briefing from the parties. A.39-43, 97-99.

### 6.   Sentencing

At the sentencing hearing on May 2, 2006, the court orally issued findings of fact: "Juror Number 4 unequivocally testified [that] after completing his internet research, which is not

disputed, he was 'just as confused as before' and that his 'research offered him no help whatsoever' and he was 'still unclear' regarding the gunshot wound which prompted his research." S.3. The hearing evidence "established that, with the exception of Juror Number 12 . . . , no other juror recalled any statements by Juror Number 4," and that "Juror Number 12 himself emphatically testified that any brief statement by Juror Number 4 had absolutely no impact or effect upon him." S.5-6. Based on this testimony, the trial court concluded that "extra record information was unquestionably not injected into the jury deliberations in the case at bar." S.7; see also S.4-5 ("Clearly, in the case now before this Court, none of such [sic] criteria, elements or conduct exist which, if present, may have tended to put the jury in possession of evidence not introduced at trial.").)

After denying the motion to set aside the verdict, the trial court then adjudicated Petitioner a second felony offender and sentenced him to an indeterminate term of twenty-five years to life on the murder count, a concurrent determinate fifteen-year term of on the second-degree weapon possession count, and a consecutive indeterminate term of three and one-half to seven years on the third degree weapons-possession count. S.9-11, 22-23.

###   C.   The Direct Appeal

On December 30, 2009, the Appellate Division, Fourth Department modified the judgment of conviction as to the third degree weapons-possession count and otherwise unanimously affirmed the conviction. People v. Carmichael, 68 A.D.3d 1704 (4th Dept.

2009). Specifically, the Fourth Department held that "the evidence [was] legally insufficient to support [Petitioner's] conviction of criminal possession of a weapon in the third degree" as to the revolver found in the safe of his mother's closet. Carmichael, 68 A.D.3d at 1705. There was "no valid line of reasoning and permissible inferences to support the conclusion that [Petitioner] exercised dominion and control over the safe, the bedroom in which the safe was located, or his mother, and thus the evidence [was] legally insufficient to establish that [Petitioner] was in constructive possession of the firearm on the date of his arrest." Id. (citations omitted).

Petitioner sought leave from the New York Court of Appeals to appeal his legal insufficiency and juror misconduct claims. On March 16, 2010, the New York Court of Appeals denied leave. People v. Carmichael, 14 N.Y.3d 798 (2010). Petitioner did not collaterally challenge his conviction in state court.

**D.   The Federal Habeas Petition**

Petitioner filed this timely pro se habeas corpus petition asserting the following claims: (1) the evidence presented at trial was legally insufficient to support the conviction for second degree murder, i.e., "the proof demonstrated lack of intent". See Petition ("Pet."), ¶22(A)); and (2) Petitioner's right to due process and a fair trial were violated when the trial court ruled that certain juror misconduct was not prejudicial. See Pet., ¶22(B).

-13-

Respondent answered the petition, asserting the affirmative defense of non-exhaustion as to the juror misconduct claim and arguing that neither claim, considered on the merits, warrants habeas relief. Petitioner did not file a reply brief.

For the reasons that follow, the petition is dismissed.

## III. Discussion

### A.    Ground One: Insufficiency of the Evidence

Petitioner asserts, as he did on direct appeal, that the evidence presented at trial was legally insufficient to support his conviction for second degree murder, i.e., "the proof demonstrated lack of intent." Pet., ¶22(A). The Fourth Department "reject[ed] the . . . contention of [Petitioner] that the evidence [was] legally insufficient to support his conviction of murder in the second degree." People v. Carmichael, 68 A.D.3d at 1705 (citation omitted). For purposes of 28 U.S.C. § 2254(d)(1), the Fourth Department's denial of the claim constituted an adjudication on the merits which was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.

The Due Process Clause of the Fourteenth Amendment prohibits a criminal conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime." In re Winship, 397 U.S. 358, 364 (1970). When reviewing a state court conviction, a federal habeas court must consider whether there was "sufficient evidence to justify a rational trier of the facts to find guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 313 (1979). After viewing he trial evidence in the light most favorable

to the prosecution, and drawing all reasonable inferences in the prosecution's favor, the habeas court must uphold the conviction if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319 (emphasis in original). The reviewing court must defer to the jury's assessment of the strength of the evidence and the credibility of the witnesses, and may not substitute its view of the evidence for that of the jury. Id.

"When it considers the sufficiency of the evidence of a state conviction, '[a] federal court must look to state law to determine the elements of the crime.'" Fama v. Commissioner of Corr. Servs., 235 F.3d 804, 811 (2d Cir. 2000) (quotation omitted). Under New York law, intentional murder requires proof "[w]ith intent to cause the death of another person, [the defendant] cause[d] the death of such person or of a third person . . . ." N.Y. Penal Law § 125.25(1). "A person cannot be punished for the crime of second degree murder under Penal Law § 125.25(1) unless the result—death—was intended." People v. Fernandez, 88 N.Y.2d 777, 781 (1996).

Petitioner here disputes only the quantum of the prosecution's proof concerning the element of intent. Under New York law, "[a] person acts intentionally with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct." N.Y. PENAL LAW § 15.05(1). A defendant's intent may be inferred from "the natural and necessary and probable consequences" of his

actions. <u>People v. Getch</u>, 50 N.Y.2d 456, 465 (1980). "Because intent is formed in the mind in secrecy and silence and the human mind functions at a speed impossible to measure, a determination of whether a deliberate intent was formed must be drawn from all the circumstances of the case." <u>Mallette v. Scully</u>, 752 F.2d 26, 32 (2d Cir. 1984) (citing 2 C. Wright, Federal Practice and Procedure, § 467 (1982). Circumstantial evidence of this subjective fact is therefore indispensable," and it "is as persuasive as direct evidence." <u>Id.</u>; <u>accord</u>, <u>e.g.</u>, <u>Dixon v. Miller</u>, 293 F.3d 74, 81 (2d Cir. 2002) (verdict may be based entirely on circumstantial evidence).

Drawing all inferences in the prosecutions's favor, there was legally sufficient evidence from which a rational trier of fact could have inferred that Petitioner's conscious objective was to shoot and kill the victim, Lewis, who concededly died from a gunshot wound to the chest. A reasonable inference that Petitioner deliberately fired at least three bullets into the group of boys with whom Lewis was standing is supported by the following facts: the deceased victim, Lewis, sustained a gunshot wound to the chest; a second victim, Williams, sustained a grazing wound to the buttocks; and the police recovered a bullet from a tree in front of 16 Langham, close to where Lewis's body was found. Given that Lewis was shot in the chest and Williams was shot in the buttocks, it was reasonable to infer that the boys were shot with two separate bullets. A rational juror likewise could have inferred that Petitioner fired the revolver projectile found in the tree in front

of 16 Langham Street. Because the projectile found in the tree was located 7.3 feet above the ground, it was reasonable to infer that this was a third bullet, and not the same bullet that passed through Lewis' chest or Williams' buttocks. Lewis was only 4'10"-tall. Obviously, Williams' buttocks were not located at a height of 7'3". There was no testimony that the shooter was on the ground and firing upwards.

In addition, Williams' testimony that the shooter pointed the gun at the boys as he fired supports an inference of intent. T.649. Although Jiminez testified that Petitioner fired "in the air," T.813, 825-27, the claim that Petitioner fired *all* of his shots "in the air" is refuted by the fact that both Lewis and Williams were struck by bullets.

Petitioner's own written statement to the police also supports the inference that he acted with the intent to kill when he shot Lewis. Petitioner admitted that he did not shoot straight up into the air but instead, when he saw a "shadow by some bushes" which "looked like a dude," he fired one shot "toward the bush". A.21. When Petitioner heard what he thought were people "jumping over" fences, he "fired two shots toward where [he] heard the noise at." A.21. Petitioner's statement supports an inference that he was intentionally shooting at the "dude" and in the direction of people whom he thought were scaling a fence because he thought they had robbed his crack house. Petitioner told the police, and Brown's testimony confirmed, that prior to the shooting, Petitioner was "mad" when he learned that his crack house had been robbed. A.20;

T.701-04, 728-29. Petitioner also told the police that he fired the shots because he "was afraid" that the robbers had returned and that he thought the "dude" by the bushes "might be an older person with bad intentions." A.22.

"[F]ederal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Wheel v. Robinson, 34 F.3d 60, 66 (2d Cir. 1994) (quotation omitted); see also People v. Gallagher, 69 N.Y.2d 525, 530 (1987) ("It is not for the [appellate court] in the first instance to determine whether defendant acted intentionally or recklessly at the time of the crime. That is the jury's function."). "[A]ssessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on appeal" or habeas review. Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996) (citations omitted). Deferring to the jury's assessments of both of these issues as required by law, the Court concludes that a rational jury could have followed a valid line of permissible inferences leading to the conclusion that it was Petitioner's conscious objective to kill the person whom he believed had just robbed his drug house, because death was the natural, necessary, and probable objective of pointing and firing a gun towards the location he believed that person or persons to be.

Although a different conclusion may not have been unreasonable, the jury's verdict certainly was supported by legally sufficient evidence under <u>Jackson v. Virginia</u>, and it therefore passes constitutional muster. As the Fourth Department correctly applied clearly established federal law in so concluding, it necessarily follows that the Fourth Department did not unreasonably apply clearly established federal law in rejecting Petitioner's insufficiency-of-the-evidence claim.

**B.    Ground Two: Juror Misconduct**

**1.    Exhaustion**

Petitioner claims that his rights to due process and a fair trial were violated when the trial court ruled that a juror's misconduct in searching the internet during jury deliberations did not prejudice Petitioner's case. Respondent argues that the claim is unexhausted because Petitioner raised it on direct appeal solely in state-law terms. Respondent further contends that the claim is procedurally defaulted because Petitioner is now barred from exhausting the claim in state court. <u>See</u> N.Y. Court Rules § 500.20(a); N.Y. Crim. Proc. Law § 440.10(2)(c).

To properly exhaust a habeas claim, a petitioner is required to present that claim to each available level of the state courts. <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845 (1999) (a habeas petitioner must invoke "one complete round of the State's established appellate review process"). The petitioner also must have fairly presented the federal nature of his claim to the state courts. <u>Duncan v. Henry</u>, 513 U.S. 364, 365 (1995) (<u>per curiam</u>); <u>see</u>

also Baldwin v. Reese, 541 U.S. 27, 29-33 (2004) (rejecting the argument that a petitioner "fairly presents" a federal claim when the state appellate court could have discerned the federal nature of the claim through review of the lower state court opinion but petitioner fails to give any indication in his appellate brief of the federal nature of the claim through reference to any federal source of law). As Respondent notes, a petitioner may apprise the state courts of the constitutional nature of his claims by explicitly arguing that a federal constitutional right was violated, either by citing to the Constitution or, "without citing chapter and verse of the Constitution," by the following means: "(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation." Smith v. Duncan, 411 F.3d 340, 348 (2d Cir. 2005) (quoting Daye v. Attorney Gen'l of N.Y., 696 F.2d 186, 194 (2d Cir. 1982) (en banc)).

In his point heading for the juror misconduct claim, Petitioner's appellate counsel stated as follows: "Trial Court's Determination That The Juror Misconduct Did Not Result In Improper Outside Influence And That No Substantial Risk Of Prejudice To Mr. Carmichael Occurred, Was Not Supported By The Record." Petitioner's Appellate Brief ("Pet'r App. Br.") at 31. This point heading

asserts the claim in terms so particular as to call to mind a specific right protected by the Constitution, namely, that the Sixth Amendment, made applicable to the States through the Due Process Clause of the Fourteenth Amendment, guarantees that "the accused shall enjoy the right to a . . . trial, *by an impartial jury . . . [and] be confronted with the witnesses against him . . . ."* U.S. Const., amend VI (emphasis supplied).

The Supreme Court reiterated in Parker v. Gladden, 385 U.S. 363 (1966), that "the evidence developed against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." 385 U.S. at 364 (quoting Turner v. State of Louisiana, 379 U.S. 466, 472-473 (1965); internal quotation marks omitted). The Supreme Court went on to note that it has "followed the 'undeviating rule,' Sheppard v. Maxwell, 384 U.S. 333, 351, 86 S.Ct. 1507, 1516, 16 L.Ed.2d 600 (1966), that the rights of confrontation and cross-examination are among the fundamental requirements of a constitutionally fair trial." Parker v. Gladden, 385 U.S. at 362-63 (citations omitted); see also id. (quoting Patterson v. People of the State of Colorado, 205 U.S. 454, 462 (1966) ("The theory of our system [of justice] is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print.")). These cases support the conclusion that Petitioner's claim, involving a juror's deliberate viewing of extra-record material, alleged "a pattern of

facts that is well within the mainstream of constitutional litigation." Daye, 696 F.2d at 194.

Furthermore, in the argument section of his brief, Petitioner's appellate counsel cited, among other cases, People v. Maragh, 94 N.Y.2d 569 (2000). Reliance on state cases employing constitutional analysis in like fact situations is an additional means of "fairly presenting" a federal claim. Daye, 696 F.2d at 194. In Maragh, the New York Court of Appeals noted that

> [t]he justification for this careful but fair rule [of deeming certain juror misconduct reversible error] originates from the awareness that jurors otherwise become "unsworn witnesses, incapable of being confronted by defendant," and their expertise injects nonrecord evidence into the calculus of judgment which a defendant cannot test or refute by cross-examination. This kind of unauthorized conduct justifies a trial court in setting aside a verdict where the circumstances are evidently prejudicial to the defendant's right to confrontation and cross-examination of witnesses.

People v. Maragh, 94 N.Y.2d at 574 (internal quotation omitted). The Maragh court's discussion, quoted above, essentially recapitulates the United States Supreme Court's rulings in, e.g., Parker v. Gladden and Turner v. State of Louisiana, that exposure of a jury to extra-record information impinges upon a defendant's Sixth Amendment rights.

The Court concludes that in the present case, the exhaustion requirement has been satisfied. Even though Carmichael's appellate counsel did not cite "chapter and verse" of the federal Constitution, his brief gave the state courts adequate notice of the substance of Carmichael's federal claim so as to allow this

Court to conclude that it has been "fairly presented" to the highest state court.

### 2.   Merits

The right to a trial by an impartial jury "means a jury capable and willing to decide the case solely on the evidence before it." Smith v. Phillips, 455 U.S. 209, 217 (1982). The Supreme Court "has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." Id. at 215 (citing Remmer v. United States, 347 U.S. 227, 229 (1954)). On habeas review, the standard for harmless error is "actual prejudice," under which a petitioner must show that the constitutional error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993) (internal quotation marks omitted); accord Fry v. Pliler, 551 U.S. 112, 121-22 (2007) (clarifying that the Brecht standard applies when reviewing a state court judgment under 28 U.S.C. § 2254(d)); see also Wood v. Ercole, 644 F.3d 83, 93-94 (2d Cir. 2011).

Here, the trial court properly held an evidentiary hearing at which each of the twelve jurors testified that his or her verdict was based solely on the evidence presented at trial. The Fourth Department accurately summarized the testimony as follows:

> [J]uror [Number 4] testified that his research disclosed no information that was helpful to him, that he remained confused about the issue even after conducting his research, and that he consequently based his verdict only on the evidence presented at the trial. . . . [T]he only juror with knowledge of the other juror's internet research testified at the hearing that he had made a

determination concerning whether the gunshot wound was a close contact wound or one inflicted from a distance before learning of the internet research, that the internet research did not affect either his decision on that issue or his verdict, and that he arrived at his verdict based on the evidence presented at the trial.

Carmichael, 68 A.D.3d at 1705-06.

There is, however, an apparent ambiguity in Juror Number 12's testimony recounting that Juror Number 4 stated "he did research on his own for a close contact gunshot wound and he just came to the conclusion on his own that, you know, basically the testimony of the defense, he didn't believe that-you know, he felt that it was not a contact gunshot wound *based on what he saw*." H.47 (emphasis supplied). It is unclear whether the phrase "what he saw" was meant by Juror Number 12 to refer to what Juror Number 4 saw at trial or what he saw on the internet. However, Juror Number 4 himself testified under oath, clearly and "unequivocally," that he based his verdict solely on the trial record. S.3. The hearing court, having heard the witnesses and observed their demeanor, resolved any ambiguity created by Juror Number 12's comment by concluding that based "upon the totality of the evidence presented at the hearing[,]" S.8, "extra record information was unquestionably not injected into the jury deliberations in the case at bar." S.7.

The Supreme Court has explained that "determinations made in Remmer-type hearings will frequently turn upon testimony of the juror in question," which is not "inherently suspect." Smith, 455 U.S. at 217 n.7 (citing Dennis v. United States, 339 U.S. 162, 171 (1950) ("One may not know or altogether understand the

imponderables which cause one to think what he thinks, but surely one who is trying as an honest man to live up to the sanctity of his oath is well qualified to say whether he has an unbiased mind in a certain matter."). Here, the juror in question, Juror Number 4, averred under oath that he was not influenced by the material he viewed; that it did not resolve any of the questions he had; and that he resolved those questions, and based his verdict, exclusively on the evidence presented at trial.

The trial court's factual findings on the questions presented by Carmichael's juror misconduct claim are presumed correct, 28 U.S.C. 2254(e)(1). See Thompson v. Keohane, 516 U.S. 99, 111 (1995) (stating that "resolution [of juror impartiality issue is a factual issue and] depends heavily on the trial court's appraisal of witness credibility and demeanor"). They are entitled to special deference given that the "determination [of juror bias or impartiality] is essentially one of credibility, and therefore largely one of demeanor." Patton v. Yount, 467 U.S. 1025, 1036 (1984); see also id. at 1040 (holding that "the ambiguity in the testimony of the cited jurors who were challenged for cause [wa]s insufficient to overcome the presumption of correctness owed to the trial court's findings"). Petitioner has not come forward with the requisite "clear and convincing evidence" to justify disregarding the presumption of correctness accorded to the trial court's factual findings. Nor has Petitioner demonstrated that the Fourth Department's adjudication of the juror misconduct claim was an "unreasonable determination of the facts in light of the evidence

presented in the [s]tate court proceeding[,]" 28 U.S.C. § 2254(d)(2). Finally, Petitioner has not established that the state courts issued decisions contrary to, or amounting to an unreasonable application of, the Supreme Court's decisions in Remmer, 347 U.S. 227, supra, and Smith v. Phillips, 455 U.S. 209, supra.

## IV. Conclusion

For the foregoing reasons, the petition (Dkt. #1) is dismissed. No certificate of appealability shall issue because Petitioner has not made a substantial showing of the denial of a constitutional right. See 28 U.S.C. § 2253(c)(2). The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3) and FED. R. APP. P. 24(a)(3), that any appeal from this Decision and Order would not be taken in good faith, and therefore leave to appeal as a poor person is denied. See Coppedge v. United States, 369 U.S. 438, 445-46 (1962). Any application for leave to appeal in forma pauperis must be made to the Second Circuit Court of Appeals in accordance with FED. R. APP. P. 24(a)(1), (4), & (5). See id. Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action.

**SO ORDERED.**

S/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:   Rochester, New York
         May 21, 2012

-26-